Brandi C. Blair, Bar #025944
Kenneth L. Moskow, Bar #029839
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone:  (602) 263-1700
Fax:  (602) 200-7833
bblair@jshfirm.com
kmoskow@jshfirm.com
Attorneys for Defendant Wexford Health
Sources, Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Sharon L. Dixon, in her own capacity and as personal representative of the Estate of Gary D. Dixon, deceased,<br><br>                    Plaintiffs,<br><br>      v.<br><br>State of Arizona, et al.,<br><br>                    Defendants. | NO. 2:13-CV-02529-DLR<br><br>**DEFENDANT WEXFORD HEALTH SOURCES, INC.'S MOTION FOR SUMMARY JUDGMENT** |

Defendant Wexford Health Sources, Inc. ("Wexford"), by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, hereby moves the Court for summary judgment on Plaintiff's claims against it.  As demonstrated by the arguments and authorities set forth below, Plaintiff cannot provide evidence sufficient to establish essential elements of each of her claims for which she bears the burden of proof.  Therefore, Wexford is entitled to judgment as a matter of law.

This Motion is supported by the following Memorandum of Points and Authorities, the separately filed Statement of Material Facts in Support of this Motion for Summary Judgment, the Court record, and any oral argument that may be heard on this matter.

//

//

4575438.1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    SUMMARY OF RELEVANT FACTS

Plaintiff Sharon Dixon brought this action in her individual capacity and as personal representative of decedent Gary Dixon's ("the decedent") estate. (Statement of Material Facts in Support of Motion for Summary Judgment ("SOF") ¶ 1). Plaintiff alleges three claims against Wexford: (1) An Eighth Amendment claim; (2) a state law wrongful death claim arising from alleged medical negligence; and (3) violation of Arizona's Adult Protective Services Act ("APSA"). (SOF ¶ 3). Each of Plaintiff's claims arise from the same allegations; namely, Wexford's medical providers did not refer the decedent for an evaluation for a liver transplant and did not provide surgical intervention to address Plaintiff's hernia. (SOF ¶¶ 4-7). Plaintiff alleges that not referring the decedent for an evaluation for a liver transplant caused the decedent's death. (SOF ¶ 8).

The Model for End Stage Liver Disease ("MELD") score is used as a basic beginning criteria to allocate organs. (SOF ¶ 17). "The MELD score equipoise is 15, with patients with scores above 15 felt to benefit from transplant while patients with scores lower than 15 felt to be harmed by transplants." (SOF ¶ 18). The decedent's MELD score was never high enough to require an evaluation for liver transplant. (SOF ¶ 18-19). Prior to 2011, the decedent's MELD score was less than 10. (SOF ¶ 19). On December 22, 2011, his MELD score was 13. (*Id.*). On April 23, 2012, his MELD score was 9. (*Id.*). On December 26, 2012, a month before he died, the decedent's MELD score was 14. (*Id.*).

Even if Plaintiff were evaluated for a liver transplant, the parties respective causation experts in this case agree that the decedent would not have been put on the recipient list for a cadaveric liver. (SOF ¶ 20). Even if the decedent would have been added to the recipient list, the parties respective causation experts in this case agree that the decedent was never eligible to receive a cadaveric liver transplant. (SOF ¶ 21).

Although he concedes that the decedent was never eligible to receive a cadaver liver, even if he were on the recipient list, (*id.*), Plaintiff's causation expert, Dr.

1    Chojkier, opined that the decedent could theoretically have had a living donor transplant.

2    (SOF ¶ 24).  Dr. Chojkier claims that eligibility for a live donor required a MELD score of

3    12, which is lower than that required for cadaveric transplants; however, Dr. Chojkier

4    relies on New York Presbyterian Hospital for this MELD score of 12, and not on any liver

5    transplant center in Arizona, or in Arizona's region.  (SOF ¶ 25).  However, according to

6    Defendants' causation expert, Dr. Alan Hemming, who is a liver transplant surgeon

7    practicing in the same region as Arizona, "the **eligibility** for cadaveric donation requires a

8    higher MELD score than does living donation . . . is not correct.  (SOF ¶ 26) (emphasis in

9    original).  Dr. Hemming goes on to state that "[a]ll patients that undergo living donor

10   transplants are first evaluated and listed  for cadaveric transplantation in the same fashion

11   as patients without a live donor" and that "[l]ive donor workup generally does not proceed

12   until the recipient has cleared all medical and psychosocial milestones."  (SOF ¶ 27).  Dr.

13   Hemming concluded that "[a] review of Mr. Dixon's record suggests to a medical

14   probability that even had Mr. Dixon been formally evaluated he would not have been

15   listed for transplantation due to both his low MELD score and psychosocial status."  (SOF

16   ¶ 28).

17           Regardless, the only known/alleged potentially willing living donor for the

18   decedent is Plaintiff Sharon Dixon.  (SOF ¶ 29).  However, Dr. Chojkier never examined

19   Plaintiff or reviewed her medical records and medical history, even though he could have

20   during discovery, and does not know Plaintiff's blood type or the decedent's blood type.

21   (SOF ¶ 30).  Therefore, Dr. Chojkier cannot testify to a degree of medical probability that

22   Plaintiff would have qualified or been permitted to be a living donor for the decedent

23   based on her medical history, health status, and tissue compatibility.  (SOF ¶¶ 30-31).

24           Dr. Chojkier also testified that a patient would be taken off of the recipient

25   list if his MELD score fell below the threshold of 15.  (SOF ¶ 23).  As a matter of

26   undisputed fact, the decedent's Meld score on April 23, 2012 was 9 and on December 26,

27   2012, one month before he died, the decedent's MELD score was 14.  (SOF ¶ 19).

28   Accordingly, the decedent's MELD score of 14 on December 26, 2012, one month before

1  he died, disqualified the decedent from receiving both a cadaveric and live donor liver

2  transplant in this region.  (SOF ¶¶ 26-28).  In short, the undisputed evidence is that the

3  decedent never would have received a liver transplant of any kind.

4  Regarding surgical intervention for the decedent's hernia, Wexford's

5  standard of care expert, Dr. Shelton, stated that "[u]mbilical hernias pose a management

6  dilemma in patients with cirrhosis, since they often develop in patients with severe liver

7  disease and ascites, and these individuals are at high risk of complications with surgical

8  repair."  (SOF ¶ 38).  "The complications and risks of surgical intervention are increased

9  in part by elevated INR and risk of bleeding, increased risk of peritoneal infection, and

10  difficult surgical outcomes due to increased intra-abdominal pressure."  (SOF ¶ 39).

11  Accordingly, the conservative treatment provided to the decedent for his hernia(s) was

12  "medically appropriate and meets community and correctional medical standards."  (SOF

13  ¶ 40).  Plaintiff's standard of care expert, Dr. Leff agreed, testifying as follows:

14
> Q.  So do I understand you correctly that your opinion is that
15  the standard of care calls for a discussion about the risks but
not necessarily an approval of him getting surgery [for his
16  hernia]?

17  A.  Correct.

18  (SOF ¶ 41).

19  ## II.    SUMMARY JUDGMENT STANDARD

20  "The court shall grant summary judgment if the movant shows that there is

21  no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); *see also Slayman v. FedEx Ground Package Sys*.,
22
*Inc*., 765 F.3d 1033, 1041 (9th Cir. 2014) (citations omitted).  The moving party bears the
23
burden of informing the court of the basis for its motion, demonstrating the absence of any
24
genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When
25
the non-moving party bears the burden of proof on a claim, Rule 56 does not require the
26
moving party to submit its motion with evidence, affidavits or other materials, negating a
27
claim.  *Id*.  Therefore, the moving party may discharge its burden on summary judgment
28

1    by pointing out to the district court that there is an absence of evidence to support the non-

2    moving party's case.  *Id*. at 325.

3         If the moving party satisfies its initial burden, the burden shifts to the

4    opposing party to establish that a genuine issue of material fact exists.  *See Matsushita*

5    *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To preclude entry of

6    summary judgment, the nonmoving party must demonstrate a dispute "over facts that

7    might affect the outcome of the suit under the governing law."  *Anderson v. Liberty*

8    *Lobby, Inc.*, 477 U.S. 242, 248 (1986).

9         The dispute must also be genuine.  *Id*.  A dispute about a material fact is

10   genuine if "the evidence is such that a reasonable jury could return a verdict for the

11   nonmoving party."  *Id*.  There is no issue for trial unless there is sufficient evidence

12   favoring the nonmoving party.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

13   The plaintiff must allege specific facts to support the claim.  *Id*.  Mere allegation and

14   speculation are not sufficient to create a factual dispute for purposes of summary

15   judgment.  *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995).  The nonmoving party

16   cannot avoid summary judgment by relying solely on conclusory allegations that are

17   unsupported by factual data.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809

18   F.2d 626, 630 (9th Cir.1987).  Instead, the opposition must go beyond the assertions and

19   allegations of the pleadings and set forth specific facts by producing competent evidence

20   that shows a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

21        If the evidence is merely colorable or is not significantly probative,

22   summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.  The moving party

23   need not disprove matters on which the opponent has the burden of proof at trial.  *See*

24   *Celotex*, 477 U.S. at 323.  "In fact, the non-moving party must come forth with evidence

25   from which a jury could reasonably render a verdict in the non-moving party's favor."  *In*

26   *re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  Therefore, summary

27   judgment is proper if the nonmoving party fails to make a showing sufficient to establish

28   the existence of an essential element of his case on which he will bear the burden of proof

4575438.1                                          5

at trial. *Celotex*, 477 U.S. at 323.

III.   **LEGAL POSITION**

    A.   **Plaintiff cannot establish proximate causation, which is an essential element of each of her claims against Wexford.**

Proximate causation is a required element of each of Plaintiff's respective claims against Wexford. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (first inquiry in municipal liability claims under § 1983 is existence of direct causal link between policy and alleged deprivation); Ariz. Rev. Stat. Ann. § 12-563 (proximate causation of injury required as element of medical negligence claim); Ariz. Rev. Stat. Ann. § 46-455(B) (causation required element of APSA claim). Plaintiff's claims are further and substantively addressed below, however, Plaintiff alleges that: (1) Wexford's policies and practices were the moving force behind the alleged failure to provide the decedent with an evaluation for a liver transplant and the alleged failure to provide surgery for the decedent's hernia (Eighth Amendment claim); and (2) that Wexford's employee medical provider(s) were negligent in not referring the decedent for an evaluation or for hernia surgery (wrongful death and APSA claims). Even if such allegations were supportable, and they are not, Plaintiff must establish a causal connection between the alleged Eighth Amendment violation and the alleged breach of the standard of care, and the decedent's death. However, based on the undisputed facts, Plaintiff cannot establish such a causal connection. (*See supra* 2:13-4:18, incorporated herein by reference as if stated *in haec verba*).

    B.   **Plaintiff cannot establish her Eighth Amendment *Monell* claim against Wexford.**

Plaintiff cannot meet her burden to establish an Eighth Amendment claim against Wexford. Wexford is not an individual, but an entity contracted with the State of Arizona to provide medical-related services. Therefore, to establish liability against Wexford under § 1983, Plaintiff must prove: (1) that the decedent possessed a constitutional right of which he was deprived; (2) that Wexford had a policy; (3) that this policy amounted to deliberate indifference to the decedent's constitutional right; and (4)

1   that the policy was the moving force behind the alleged constitutional violation.

2   *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011); *Tsao v. Desert Palace*,

3   *Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying municipal liability under § 1983 to

4   private entities acting under color of law).   Plaintiff must also demonstrate a proximate

5   causal connection between an official Wexford policy or practice and the claimed injury.

6   *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) ("[The] first inquiry in any case

7   alleging municipal liability under § 1983 is the question whether there is a direct causal

8   link between a municipal policy or custom and the alleged constitutional deprivation.").

9   To the extent that Plaintiff attributes alleged wrongdoing to Wexford through the actions

10   of its employees, "*[r]espondeat superior* or vicarious liability will not attach under §

11   1983.*"   City of Canton*, 489 U.S. at 385.

12          In *Diaz v. Williams*, a case similar to the case at bar, an inmate alleged that

13   prison medical staff provided constitutionally inadequate care when, among other things,

14   he was not given consideration for a liver transplant.  *Diaz v. Williams*, No. 12-CV-05895-

15   WHO (PR), 2015 WL 1407305, at *3 (N.D. Cal. 2015).  The *Diaz* Court's holding, and

16   reasoning is instructive.

> Diaz's assertions that defendants continuously refused or denied requests to see specialists has little bearing on the denial of his liver transplant, which is determined primarily by MELD score. The MELD system is simply a formula used to calculate a score based on a patient's date of birth, values for serum bilirubin, serum creatinine, and prothrombin time ("INR"), and whether the patient is undergoing dialysis. The September 2008 CDCR Guidelines provide transplantation evaluations for patients with a MELD score of 15 or higher. The United Network for Organ Sharing ("UNOS"), the single national database and waitlist for organ transplantation, uses MELD scores to rank a patient's priority for liver transplantation, with a maximum score of 40 indicating the highest priority.
>
> Diaz's claim that defendants 'produce no evidence that they followed the MELD system to the letter' is without merit. Diaz underwent repeated blood tests, which included measurements of these values that were used to calculate his MELD score. Diaz's highest recorded MELD score was 12. **Diaz's MELD score precluded him from consideration for transplantation under the Guidelines. It indicated that he would be a relatively low priority even if he were referred**

to the UNOS waitlist. **In short, it showed that his chances of receiving a transplant were slim.** Diaz has not shown a genuine dispute that defendants' decision to not recommend him for a transplant was 'medically unacceptable under the circumstances' and that they embarked on this course in 'conscious disregard of an excessive risk' to his health.

*Diaz*, 2015 WL 1407305, at *5-6 (emphasis added). Based on the above, the *Diaz* Court granted the defendant's motion for summary judgment. *Id*. at *6.

Like the plaintiff in *Diaz*, the decedent's chances of receiving a transplant were not only "slim," but the parties respective causation experts agree that he was never eligible for a transplant prior to his death. The decedent did not possess a constitutional right to be evaluated for a liver transplant in this case because an evaluation was not medically necessary under the circumstances. (SOF ¶¶ 18-21). In fact, the decedent's MELD score was below the threshold to get on the recipient list, let alone receive a cadaveric or donated liver. (*Id*.). Additionally, not only was corrective surgery for the decedent's hernia not medically necessary, it was contraindicated. (SOF ¶¶ 38-39).

The ADC policies, which Wexford was contractually obligated to follow, were not unconstitutional. (SOF ¶¶ 33-35). Per Wexford's contract with the State of Arizona, Wexford followed ADC polices. (SOF ¶ 33). The ADC policy that addressed organ donation during the relevant period was Department Order 922, effective January 28, 2009. (SOF ¶ 34). As regards organ donations, for which inmates are potential organ recipients, DO 922 provides, "The Department will consider organ transplantation as a medical treatment option for inmates if it is determined to be medically necessary." (SOF ¶ 35). This is the only policy relevant to organ transplants.

Moreover, the relevant policies were not a moving force behind the alleged deprivation; the decedent's medical provider's, both in-house clinicians and outside specialists, determined the decedent's treatment, and no policies existed to prevent each medical provider's reliance on his/her own medical judgment. (SOF ¶ 36-37). Regardless, as stated, Plaintiff's MELD scores in April and December 2012 were 9 and 14 respectively, which were too low for both cadaveric and living donor liver transplantation.

1   (SOF ¶¶ 18-26).   Additionally, there is no evidence that the decedent or Plaintiff were

2   eligible for a live donor transplant, medically or based on social history.

3          The clinician(s) directly involved in the decedent's care, including his

4   outside specialists, were responsible for determining whether organ transplantation is

5   medically necessary.   (SOF ¶ 36).   Here, the decedent's clinicians, both in-house

6   providers and outside specialists, did not recommend evaluation for a liver transplant.

7   (SOF ¶ 37).  Regardless, the applicable policy permitted consideration for organ transplant

8   as a treatment option when medically necessary.   On its face, the relevant policy is not

9   deliberately indifferent; there is nothing unconstitutional about permitting a medically

10  necessary treatment option.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citations

11  omitted).    Even if the decedent's treating clinicians' respective decisions not to

12  recommend an evaluation for transplant constitutes a constitutional deprivation, and in

13  this case it does not, the alleged deprivation did not result from a policy that specifically

14  *permits* such a recommendation and treatment.

15         Likewise, relevant policies regarding treatment of hernias were also

16  constitutional.   Wexford's 30(b)(6) witness, Dr. Neil Fisher testified that "[d]ecisions

17  regarding a patients' suitability for consideration of abdominal wall herniography must be

18  made on a case-by-case basis" by a patient's clinician.   (SOF ¶ 42).   Again, there is

19  nothing unconstitutional about a policy permitting a hands-on clinician to determine

20  his/her patient's treatment, including a recommendation for surgical repair of a hernia.

21         The decedent was not deprived of a constitutional right; he was provided

22  appropriate treatment.  Regardless, Plaintiff cannot demonstrate that Wexford had a policy

23  that amounted to deliberate indifference to the decedent's constitutional rights and that

24  such a policy was the moving force behind the alleged constitutional violation.

25  Additionally, Plaintiff cannot establish a causal connection between any policies and the

26  alleged deprivation and the decedent's death.  There is no dispute over the facts that (1)

27  applicable policies established that the decedent's hands-on clinicians determined

28  treatment for the decedent's cirrhosis and his hernia; (2) the decedent was not eligible to

receive a cadaver liver, given his MELD score; and (3) that he was likewise not eligible to receive a live-donor liver.  Therefore, Plaintiff cannot maintain her Eighth Amendment claim against Wexford.  *Dougherty*, 654 F.3d at 900.  Accordingly, Wexford is entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim.

## C.    Plaintiff's state law Adult Protective Services Act claim fails.

Plaintiff cannot establish a state law APSA claim against Wexford.  The APSA statute creates a civil cause of action for a vulnerable adult who has been "injured by neglect, abuse or exploitation."  Ariz. Rev. Stat. Ann. § 46-455(B); *Estate of McGill ex rel. McGill v. Albrecht*, 203 Ariz. 525, 528, ¶ 7, 57 P.3d 384, 387 (2002) (citing same). Under the APSA, "vulnerable adult" is defined as "an individual who is eighteen years of age or older and who is unable to protect himself from abuse, neglect or exploitation by others because of a physical or mental impairment."  Ariz. Rev. Stat. Ann. § 46-451(A)(9).  "Vulnerable adult" includes an incapacitated person as defined by A.R.S. § 14-5101 "to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person."  *Id*.; *see also* Ariz. Rev. Stat. Ann. § 14-5101(1).  Additionally, "to be actionable abuse under APSA, the negligent act or acts (1) must arise from the relationship of caregiver and recipient, (2) must be closely connected to that relationship, (3) must be linked to the service the caregiver undertook because of the recipient's incapacity, and (4) must be related to the problem or problems that caused the incapacity. *Estate of McGill*, 203 Ariz. at 530, ¶ 16, 57 P.3d at 389.  The Arizona Supreme Court found that, in enacting the APSA, "the legislature's obvious intent [was] to protect a class of mostly elderly or mentally ill citizens from harm.  *Id*. at 529, ¶ 14, 57 P.3d at 388.

The decedent was not a vulnerable adult under the APSA.  He was not unable to protect himself from abuse, neglect or exploitation by others because of a physical or mental impairment.  He was not elderly[1] or mentally ill.  (SOF ¶¶ 13-16).

---

[1] It is well-established in the records that the decedent's date of birth is March 22, 1962.

1   Moreover, the decedent's friend and cell mate in prison, Darren Stanley, testified that he

2   lived with and spent time with the decedent every day from April 2012 until the decedent

3   was taken to the hospital in January of 2013.  (SOF ¶ 15).  Mr. Stanley testified that the

4   decedent was able to communicate effectively, was coherent, was aware, and "[h]e was

5   like that till [sic] the day they took him out."  (SOF ¶ 16).

6           Even if the decedent was a vulnerable adult under the APSA, and he was

7   not, Wexford's duties do not establish liability under the APSA.  *Wagner ex rel. Estate of*

8   *Vogel v. Maricopa Cnty.*, No. CV07-00819-PHX-EHC, 2008 WL 7484177, at *7 (D.

9   Ariz. 2008).  In *Wagner*, the court found that the APSA did not apply to a prisoner in jail,

10  even though he was demonstrably mentally ill, because, despite the sheriff's responsibility

11  to provide medical/mental health care in jail, the prisoner was not in jail to receive

12  medical/mental health care, but because he was incarcerated for a crime.  *Id*.  Likewise, in

13  the instant case, the decedent was in prison for the purpose of serving a criminal sentence,

14  and not for the purpose of obtaining health care, which was incidental and aside from his

15  incarceration.

16          Further still, even if the APSA applied, and it does not, Plaintiff cannot

17  establish a causal connection between the decedent not being referred for an evaluation

18  for transplant or undergoing surgical repair for a hernia and the decedent's death.  Based

19  on the foregoing, Plaintiff's APSA claim cannot survive summary judgment.

20          **D.    Plaintiff cannot establish her wrongful death claim.**

21          Plaintiff's wrongful death claim is rooted in a negligence claim against

22  Wexford.  (SOF ¶ 3).  Wexford is a corporate entity and does not provide medical care to

23  inmates; Wexford's employee medical clinicians provide care.  Plaintiff therefore alleges

24  that Wexford is vicariously liable for the decedent's alleged wrongful death.  (*Id*.).  As

25  applicable to this case, "[i]f the defendant is a health care institution that employs a health

26  professional against whom or on whose behalf the testimony is offered, the provisions of

27  [A.R.S. 12-2604(A)] apply as if the health professional were the party or defendant

28  against whom or on whose behalf the testimony is offered."  Ariz. Rev. Stat. Ann. § 12-

2604(B).  In her Second Amended Complaint, Plaintiff does not allege that any *particular* Wexford employee medical provider was negligent.  (SOF ¶¶ 9-10).  Likewise, in his two reports and in his deposition, Plaintiff's standard of care expert, Dr. Leff, did not name a specific medical provider or providers who are responsible for the acts or omissions about which he opined.  (SOF ¶ 11).  This is despite the fact that, in her Second Amended Complaint, Plaintiff stated that she would replace fictional Defendants, including "John and Jane Doe Health Care Providers," "once such names and identities are known to Plaintiff."  (SOF ¶ 9).  However, even though she possessed the decedent's medical records and disclosed the identities of *forty-one* individual Wexford clinicians of multiple licensure levels, Plaintiff never amended her Complaint to refer to, or to name as defendants, any of these clinicians.  (SOF ¶ 10).  Therefore, there is no tortfeasor for whose alleged negligence Wexford may be vicariously liable.  Additionally, because Dr. Leff is a medical doctor, if an alleged theoretical tortfeasor is a nurse, nurse practitioner, or physician's assistant, Plaintiff failed to disclose a qualified expert as statutorily required.  Ariz. Rev. Stat. Ann. § 12-2604(A).

Plaintiff's standard of care expert, Dr. Leff, may be qualified to testify regarding the standard of care for a medical doctor in a correctional facility context; however, because neither Plaintiff nor her standard of care expert named a medical doctor (or anyone else) as a tortfeasor, Plaintiff cannot satisfy the elements of her wrongful death claim, which arises from alleged medical negligence.  *See* Ariz. Rev. Stat. Ann. § 12-561- 12-562.  The applicable statute, which states the elements of a medical negligence claim, provides:

> Both of the following shall be necessary elements of proof that injury resulted from the failure of a health care provider to follow the accepted standard of care:
>
> (1) The health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider [practicing correctional facility medicine] within the state acting in the **same or similar circumstances**; and
>
> (2) Such failure was a proximate cause of the injury."

1    Ariz. Rev . Stat. Ann. §, 12-563 (emphasis added).  Multiple medical providers of varying

2    levels of licensure treated the decedent during the relevant period.   (SOF ¶ 10).

3    Accordingly, because neither Plaintiff nor her standard of care expert identified any

4    individual tortfeasors, Plaintiff cannot establish the "same or similar circumstances" that

5    would establish the standard or care.   Additionally, Plaintiff's standard of care expert

6    testified that the standard regarding treatment of the decedent's hernia called for a

7    discussion regarding a refusal provide surgical intervention, but did not require surgical

8    intervention under the circumstances.  (SOF ¶ 41).

9              Furthermore, Plaintiff cannot establish the second required element:

10   proximate causation.  There is no causal connection between not referring the decedent for

11   an evaluation for transplant and his death.  As stated, it is undisputed that: (1) Plaintiff

12   was not eligible to receive a cadaver liver, given his MELD score; and (2) that he was not

13   eligible to receive a live donor liver because his MELD score shortly before his death was

14   14 and because there is no evidence that the decedent was a candidate for such surgery or

15   that his wife was a qualified live-donor.   Therefore, even if he were evaluated, the

16   decedent would not have been provided a transplant and the cause(s) of the decedent's

17   death would remain the same.

18           **E.**      **Plaintiff is not entitled to punitive damages.**

19             Punitive damages are not recoverable against Wexford.  Municipalities are

20   immune from punitive damages under §1983.  *Mitchell v. Dupnik*, 75 F.3d 517, 527 (9th

21   Cir. 1996) (citing *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981)).  As

22   the Ninth Circuit Court of Appeals held, "we see no basis in the reasoning underlying

23   *Monell* to distinguish between municipalities and private entities acting under color of

24   state law.  *Tsao*, 698 F.3d at 1139.  Therefore, because private entities, like Wexford, are

25   not distinguished from municipalities for purposes of § 1983, Wexford is immune from

26   punitive damages in this matter.

27             Even if punitive damages were recoverable from Wexford, Plaintiff is not

28   entitled to such damages.  Regarding Plaintiff's Eighth Amendment claim, the relevant

4575438.1                                                    13

policies permit transplantation and outside referrals for evaluation when medically necessary.   Such policies, on their face, do not reflect conduct that is malicious, oppressive or in reckless disregard of the decedent's rights.   *See* 9th Cir. Model Jury Instruction 5.5.   On the state law claims, punitive damages are likewise not recoverable. Plaintiff failed to name a specific tortfeasor or tortfeasors.   Accordingly, Plaintiff cannot establish by clear and convincing evidence the required mental state; namely, that the unnamed, unknown individual Wexford employees had an "'evil mind' and aggravated and outrageous conduct." *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 331, 723 P.2d 675, 680 (1986)

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff cannot establish essential elements to support each of her claims for which she bears the burden of proof.   Wexford therefore respectfully requests the Court to grant its Motion for Summary Judgment and enter judgment in its favor on all of Plaintiff's claims.

DATED this 29th day of October, 2015.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/Kenneth L. Moskow
    Brandi C. Blair
    Kenneth L. Moskow
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona  85012
    Attorneys for Defendant Wexford Health
    Sources, Inc.

4575438.1

14

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that on this 29th day of October, 2015, I caused the

3 foregoing document to be filed electronically with the Clerk of Court through the

4 CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF

5 system.

6

7 /s/Amy Ebanks_____

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28