**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sharon L. Dixon,<br><br>    Plaintiff,<br><br>v.<br><br>Arizona Department of Corrections, et al.,<br><br>    Defendants. | No. CV-13-02529-PHX-DLR<br><br>**ORDER** |

Before the Court are the summary judgment motions filed on behalf of Defendant Wexford Health Sources, Inc. ("Wexford") and Defendants State of Arizona ("State"), Former Arizona Department of Corrections ("ADOC") Health Services Division Director Michael Adu-Tutu, ADOC Health Services Contract Monitoring Bureau Assistant Director Arthur Gross, ADOC Inspector General Greg Lauchner, ADOC Health Services Division Interim Director Richard Pratt, and ADOC Director Charles Ryan (collectively "Named State Defendants"). (Docs. 158, 160.) The motions are fully briefed.[1] For the following reasons, the motions are granted.

## **BACKGROUND**

Gary Dixon was an inmate at the ADOC Eyman Facility. (Doc. 159, ¶ 2; Doc. 161, ¶ 1.) On January 13, 2010, upon intake screening and evaluation, it was noted that

---

[1] The parties' requests for oral argument are denied because the issues are adequately briefed and oral argument will not aid the Court's resolution of the motions. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f).

Dixon had numerous health conditions, including hepatitis C, a supraumbilical hernia, and cirrhosis. (Doc. 159, ¶¶ 2, 12; Doc. 161, ¶ 1.) Throughout his incarceration, Dixon received medical treatment for his conditions—including blood tests, abdominal sonograms and ultrasounds, and esophagogastroduodenoscopies—from both in-house and outside medical providers. (Doc. 159, ¶ 37; Doc. 161, ¶¶ 2-10.)

Beginning July 1, 2012, ADOC contracted with Wexford to provide medical services to state prison complexes. (Doc. 159, ¶ 32.) The contract required Wexford to follow ADOC's policies regarding inmate medical care. (Doc. 159, ¶¶ 33-34.) During the relevant time period, it was ADOC's policy to "consider organ transplantation as a medical treatment option for inmates if it is determined to be medically necessary." (Doc. 159, ¶ 35; Doc. 161, ¶ 12.) Dixon's in-house and outside medical providers were responsible for determining whether organ transplantation was necessary, and none recommended that he be evaluated for a liver transplant. (Doc. 159, ¶¶ 36-37; Doc. 161, ¶ 11.)

On January 22, 2013, Dixon had a sudden decompensation from sepsis, likely related to a urinary tract infection. (Doc. 161, ¶ 26.) He was admitted to the hospital, but his condition deteriorated rapidly and he died on January 28, 2013. (*Id.*)

Plaintiff Sharon Dixon brought this action in her capacity as Dixon's spouse and personal representative of his estate, alleging violations of 42 U.S.C. § 1983 and Arizona's Adult Protective Services Act ("APSA"), A.R.S. § 46-451, *et seq.*, and a claim for wrongful death. (Doc. 159, ¶ 1; Doc. 55 at 16-18.) Plaintiff alleges that liver transplantation was the only definitive treatment for Dixon's end-stage liver disease, that he died because he was not evaluated for and did not receive a liver transplant, and that liver transplantation would have reduced the discomfort caused by Dixon's hernias. (Doc. 55, ¶¶ 70-72.) Defendants move for summary judgment on all counts.

## **LEGAL STANDARD**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248).  Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).  Furthermore, the party opposing summary judgment "may not rest upon mere allegations of denials of pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995); *see also* Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). If the nonmoving party's opposition fails to specifically cite to materials either in the court's record or not in the record, the court is not required to either search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028-29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417-18 (9th Cir. 1988).

## **DISCUSSION**

Preliminarily, Plaintiff's response brief, separate statement of facts, and controverting statement of facts do not comply with LRCiv 56.1.  Plaintiff fails to support many statements of fact with citations to admissible portions of the record.  LRCiv

56.1(a)-(b). Further, Plaintiff fails to support the vast majority of assertions made in her response memorandum with citations to the specific paragraphs in her statement of facts. LRCiv 56.1(e). Accordingly, for purposes of this order the Court deems admitted any assertion not appropriately denied by Plaintiff, and disregards all assertions that are not supported by citation to admissible portions of the record. *See Szaley v. Pima Cty.*, 371 F. App'x 734, 735 (9th Cir. 2010).

**I. Section 1983**

Section 1983 provides a cause of action for those who have been deprived of their constitutional rights by persons acting under color of law. 42 U.S.C. § 1983. It is a mechanism "for vindicating federal rights elsewhere conferred," and "is not itself a source of substantive rights." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005) (internal quotations and citation omitted). To succeed on a claim under § 1983, a plaintiff must show "(1) that a right secured by the Constitution or the laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under color of State law." *Long v. Cty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This is a two-part inquiry:

> First, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. This second prong . . . is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Indifference "may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care."

*Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)). Deliberate

- 4 -

indifference is a higher standard than mere negligence; "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

Plaintiff brings her § 1983 claim against Wexford and the Named State Defendants. She alleges that the failure to evaluate Dixon for a liver transplant rises to the level of deliberate indifference.

### A. Named State Defendants

Plaintiff seeks to hold the Named State Defendants responsible in their individual, supervisory capacities. (Doc. 169 at 8-9; Doc. 43 at 7-9.) "*Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). Instead, a plaintiff must show "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). A supervisory official may be held liable for the acts of his subordinates by participating in or directing the violations, failing to prevent violations of which the supervisor is aware, or by "set[ting] in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional harms." *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009) (internal quotations and citations omitted).

Plaintiff provides no evidence that any of the Named State Defendants had direct involvement or knowledge of Dixon's medical care, nor does she provide evidence that any of the Named State Defendants set in motion a series of acts that they should have known would cause those who were directly involved in Dixon's care to engage in unconstitutional behavior. Instead, Plaintiff's claim rests on allegations that the Named State Defendants had a policy, practice, or custom of providing inmates inadequate health care. (*See* Doc. 169 at 10 ("The evidence disclosed and developed in discovery shows a pattern and practice of not meeting the medical needs of inmates, including Mr. Dixon.").) Such allegations are relevant only to a claim against local government officials acting in their official capacities. *See Cortez v. Cty. of L.A.*, 294 F.3d 1186,

1188 (9th Cir. 2001) ("A municipality or other local government entity . . . may be sued for constitutional torts committed by its officials according to an official policy, practice, or custom." (citing *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)). However, "a state and its officials sued in their official capacity are not considered 'persons' within the meaning of § 1983, due to the sovereign immunity generally afforded states by the Eleventh Amendment." *Id.* Although there is an exception to this general rule for claims seeking prospective injunctive relief, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989), Plaintiff seeks only monetary damages for her claims.[2] Accordingly, the Named State Defendants are entitled to summary judgment on Plaintiff's § 1983 claim because Plaintiff has not supplied evidence that any of the Named State Defendants had direct involvement in or knowledge of Dixon's care.

**B. Wexford**

The liability of private entities acting under color of state law is assessed by the same legal standards applicable to municipalities. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) ("[W]e see no basis in the reasoning underlying *Monell* to distinguish between municipalities and private entities acting under color of state law.") Thus, to succeed on her § 1983 claim against Wexford, Plaintiff must show that Wexford had a policy, practice, or custom that was the moving force behind the alleged violation of Dixon's Eighth Amendment rights. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). Wexford cannot be liable under a *respondeat superior* theory. *See Tsao*, 698 F.3d at 1139 (citing *Monell*, 436 U.S. at 691).

Wexford's contract required it to follow ADOC's policies regarding medical care. During the relevant time period, ADOC's official policy was to "consider organ transplantation as a medical treatment option for inmates if it is determined to be medically necessary." (Doc. 159, ¶ 35.) Plaintiff does not argue that this policy is

---

[2] To the extent Plaintiff is attempting to pursue a claim for monetary damages against the Named State Defendants in their official capacities based on an allegedly unconstitutional policy, practice, or custom, her claim is barred by the Eleventh Amendment. (*See* Doc. 139 at 4 n.3.)

- 6 -

unconstitutional. Instead, without citing any factual support in the record, Plaintiff argues that Wexford "had a custom and practice of ignoring its own policy." (Doc. 169 at 2.)

Throughout his incarceration, Dixon was treated by both in-house and outside medical providers, none of whom recommended that Dixon be evaluated for a liver transplant. These medical providers were responsible for determining whether organ transplantation was medically necessary. Plaintiff points to no ADOC or Wexford policy that was the moving force behind these providers' decisions. Instead, Plaintiff offers slides prepared by Wexford for a meeting with ADOC in November 2012 in which Wexford expressed concerns about the adequacy of inmate health care generally. (Doc. 168, ¶ 16.) In essence, Plaintiff argues that, because Wexford believed ADOC was not providing constitutionally adequate inmate care, Dixon's death must have been a direct result of these deficiencies. But she offers no evidence connecting any particular policy, practice, or custom to the decision of Dixon's in-house and outside medical providers to not recommend him for a liver transplant evaluation. Plaintiff might disagree with Dixon's medical providers about the medical necessity of a liver transplant, but it does not follow that the decision not to recommend Dixon for a liver transplant was the result of an unconstitutional policy, practice, or custom. *See Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) ("[A] difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference." (internal quotations and citation omitted)). Accordingly, Wexford is entitled to summary judgment on Plaintiff's § 1983 claim because Plaintiff has not offered evidence that the treatment recommendations of Dixon's health care providers were the result of an unconstitutional policy, practice, or custom of Wexford.

**II. Wrongful Death**

Pursuant to A.R.S. § 12-611, Plaintiff brings her wrongful death claim against the State and Wexford based on a theory of medical negligence. To succeed, Plaintiff must prove:

> 1. The health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances.
>
> 2. Such failure was a proximate cause of the injury.

A.R.S. § 12-563. The State and Wexford are not, themselves, health care providers. Instead, they employed the clinicians responsible for Dixon's health care. Thus, Plaintiff must demonstrate that the State and Wexford are vicariously liable for the alleged medical negligence of their employee health care providers. *See* A.R.S. § 12-2604(B) ("If the defendant is a health care institution that employs a health professional against whom or on whose behalf the [standard of care] testimony is offered, the provisions [A.R.S. § 12-2604(A)] apply as if the health professional were the party or defendant against whom or on whose behalf the testimony is offered.")

However, Plaintiff identifies no specific clinician(s) whose care allegedly fell below acceptable medical standards. Her Second Amended Complaint names "John and Jane Doe Health Care Providers" and states that she will replace the fictional defendants "once such names and identities are known to Plaintiff." (Doc. 55, ¶ 15.) Despite possessing medical records disclosing the identities of forty-one of Dixon's medical providers, Plaintiff never amended her complaint to add the names of the allegedly negligent medical providers, nor has she provided this information in her response to Defendants' summary judgment motions. (Doc. 159, ¶ 10.)

Plaintiff's omission is problematic for many reasons. For example, her failure to identify specific clinicians whose treatment she believes fell below the standard of care makes it impossible to determine whether Dr. Leff is qualified to offer standard of care opinions. Under Arizona law:

> In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and the person meets the following criteria:
>
> *1. If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty or claimed specialty as the*

- 8 -

*party against whom or on whose behalf the testimony is offered. If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist who is board certified, the expert witness shall be a specialist who is board certified in that specialty or claimed specialty.*

2. During the year immediately preceding the occurrence giving rise to the lawsuit, devoted a majority of the person's professional time to either or both of the following:

*(a) The active clinical practice of the same health profession as the defendant and, if the defendant is or claims to be a specialist, in the same specialty or claimed specialty.*

(b) The instruction of students in an accredited health professional school or accredited residency or clinical research program *in the same health profession as the defendant and, if the defendant is or claims to be a specialist, in an accredited health professional school or accredited residency or clinical research program in the same specialty or claimed specialty.*

3. If the defendant is a general practitioner, the witness has devoted a majority of the witness's professional time in the year preceding the occurrence giving rise to the lawsuit to either or both of the following:

(a) Active clinical practice as a general practitioner.

(b) Instruction of students in an accredited health professional school or accredited residency or clinical research program *in the same health care profession as the defendant.*

A.R.S. § 12-2604(A) (emphasis added). Defendants and the Court cannot evaluate whether Dr. Leff shares the same profession, specialty, or board certification(s) as the clinicians who Plaintiff claims provided substandard medical care because Plaintiff has not identified them.

More importantly, however, Plaintiff's omission is fatal to her claim because she is required to prove that Dixon's health care provider(s) "failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider *in the profession or class to which he belongs . . . acting in the same or similar circumstances.*" A.R.S. § 12-563 (emphasis added). Plaintiff cannot establish this element without identifying the profession or class of the allegedly negligent health care provider(s), or the circumstances under which the provider(s) administered care. Further, and on a more fundamental level, Plaintiff has not identified specific tortfeasors for whose alleged negligence either the State or Wexford may be vicariously liable. Accordingly, the State

and Wexford are entitled to summary judgment on Plaintiff's wrongful death claim.

**III. APSA**

Plaintiff alleges that Wexford violated APSA, which creates a civil cause of action for:

> [a] vulnerable adult whose life or health is being or has been endangered or injured by neglect, abuse or exploitation . . . against any person or enterprise that has been employed to provide care, that has assumed a legal duty to provide care or that has been appointed by a court to provide care to such vulnerable adult . . . .

A.R.S. § 46-455(B). A vulnerable adult is someone "who is unable to protect himself from abuse, neglect or exploitation by others because of a physical or mental impairment," or who is incapacitated "by reason of mental illness, mental deficiency, mental disorder, physical illness or disability, chronic use of drugs, chronic intoxication or other cause . . . to the extent that he lack sufficient understanding or capacity to make or communicate responsible decisions concerning his person." A.R.S. §§ 46-451(A)(9), 14-5101(1).

> [T]o be actionable abuse under APSA, the negligent act or acts (1) must arise from the relationship of caregiver and recipient, (2) must be closely connected to that relationship, (3) must be linked to the service the caregiver undertook because of the recipient's incapacity, and (4) must be related to the problem or problems that caused the incapacity.

*Estate of McGill ex rel. McGill v. Albrecht*, 57 P.3d 384, 389 (Ariz. 2002). In enacting APSA, "the legislature's obvious intent to protect a class of mostly elderly or mentally ill citizens from harm caused by those who have undertaken to give them the care they cannot provide for themselves." *Id.* at 388.

Although it is undisputed that Dixon had many physical impairments,[3] (Doc. 159, ¶ 12), Plaintiff provides no evidence that these impairments rendered him incapable of protecting himself from abuse, neglect, or exploitation, or that he lacked the understanding or capacity to communicate regarding his medical care. Indeed, Dixon's

---

[3] Plaintiff argues that Dixon was mentally impaired, but it is undisputed that Dixon required no mental health services while incarcerated. (Doc. 159, ¶¶ 13-16.)

- 10 -

cellmate, Darren Stanely, testified that Dixon was coherent and able to communicate effectively until the day he died. (*Id.*, ¶ 16.) Plaintiff argues that Dixon was incapable of making his own medical decisions because "he was totally dependent on Defendants for his daily needs and medical care and, as such, was physically impaired to such an extent that he was unable to protect himself from abuse and neglect."[4] (Doc. 169 at 13.) But incarceration is not synonymous with incapacitation as described in A.R.S. § 14-5101(1). Nor does the fact that a person might rely on prison officials for daily needs and medical care mean that he is unable to protect himself due to physical or mental impairments as required by A.R.S. § 46-451(A)(9). Wexford is entitled to summary judgment on Plaintiff's APSA claim because Plaintiff has not offered evidence that Dixon was a vulnerable adult as defined by Arizona law.

**IV. Causation**

In addition to the reasons explained above, Defendants are entitled to summary judgement on all claims because Plaintiff will be unable to prove that Defendants' actions or inaction caused Dixon's death. Proximate causation is an element of all of Plaintiff's claims. *See City of Canton*, 489 U.S. at 385 ("The first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."); A.R.S. § 12-563 (stating that proximate cause is a required element of a medical negligence claim); A.R.S. § 46-455(B) (creating cause of action against caregiver who causes endangerment or injury). The crux of Plaintiff's case is that Defendants should have evaluated Dixon for a liver transplant. However, it is undisputed that Dixon was not eligible to receive a cadaveric liver transplant. (Doc. 159, ¶¶ 19-23.)

Dr. Leff opined that Dixon should have had the opportunity to be assessed by a transplant team for a partial liver transplant from a living donor. (Doc. 161-12 at 40.) Plaintiff's causation expert, Dr. Mario Chojkier, opined that Dixon theoretically could

---

[4] Plaintiff uses the plural "Defendants," but her APSA claim is against Wexford only. There is no evidence that Wexford contracted to provide ADOC inmates with their "daily needs."

- 11 -

have had a living donor transplant. (Doc. 159, ¶ 24.) However, the only known and potentially willing living donor identified by Plaintiff is herself. (Doc. 159, ¶ 29.) None of Plaintiff's medical experts examined her or reviewed her medical history to determine whether she was a suitable donor. (*Id.*, ¶ 30.) Although Dr. Chojkier testified that a living donor could be "friends, relatives, neighbors, and good Samaritans," (Doc. 168 at 12, ¶ 26), Plaintiff offers no evidence of any known friends, relatives, neighbors, or good Samaritans willing and suitable to donate part of their liver to Dixon. Accordingly, Plaintiff will be unable to show at trial that Dixon would have received a partial liver from a living donor had he been evaluated for one.

Plaintiff argues that the evidence is sufficient to have a jury determine causation based on a "loss of chance theory." (Doc. 169 at 14-15.) She relies on *Thompson v. Sun City Community Hospital*, in which the Arizona Supreme Court adopted the rule from the Restatement (Second) of Torts § 323 that:

> One who undertakes, . . . to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm . . . .

688 P.2d 605, 616 (Ariz. 1984). Plaintiff contends that Defendants increased Dixon's risk of harm by failing to evaluate him for a partial liver transplant from a living donor.

*Thompson* involved delayed treatment. In that case, the plaintiff suffered a transected femoral artery and was taken to the emergency room, where it was determined that he required surgery. *Id.* at 607-08. The plaintiff's insurance did not satisfy the hospital's financial requirements for admission, so he was transferred to a different hospital when his condition stabilized. *Id.* at 608. Although he underwent and survived surgery, he experienced residual impairment in his left leg. *Id.* He sued the transferor hospital for medical negligence, and appealed the trial court's refusal to instruct that jury that causation could be established by proof that the defendant's acts or omissions had increased his risk of harm. *Id.* at 613.

The Arizona Supreme Court reversed the trial court, concluding that causation is a

1 jury question "[e]ven if the evidence permits only a finding that the defendant's
2 negligence increased the risk of harm or deprived plaintiff of some *significant* chance of
3 survival or better recovery . . . ." *Id.* at 614-16 (emphasis added). However, the court
4 noted that its decision applies to a "limited class of cases in which [a] defendant
5 undertook to protect [a] plaintiff from a particular harm and negligently interrupted the
6 chain of events, thus increasing the risk of that harm," and cautioned that "this rule fits
7 only in those situations where the courts traditionally have allowed juries to deal more
8 loosely with causation . . . ." *Id.* at 616. The Arizona Court of Appeals later interpreted
9 *Thompson* to require evidence that a defendant deprived a plaintiff of a *substantial*
10 chance of survival or a better outcome. *Lohse v. Faultner*, 860 P.2d 1306, 1316 (Ariz.
11 Ct. App. 1992).

12 Here, Plaintiff has not shown that "loss of chance" causation is applicable to this
13 case. This is not a situation in which Defendants "negligently interrupted the chain of
14 events, thus increasing the risk of . . . harm" to Dixon. *Thompson*, 688 P.2d at 616.
15 Instead, Plaintiff and Dr. Leff merely disagree with the conservative treatment provided
16 to Dixon by his medical providers. Nor has Plaintiff provided any authority that
17 *Thompson* applies outside the medical malpractice context.

18 Moreover, assuming *Thompson* applies, Plaintiff has not provided evidence
19 "ris[ing] to the level of substantiality." *Lohse*, 860 P.2d at 1316. There is no evidence
20 that any suitable living donors would have been willing to donate part of their liver to
21 Dixon had he been evaluated for a transplant. Dr. Chojkier does not opine to any degree
22 of probability that Dixon would have found a suitable donor and received a partial liver
23 transplant. It is undisputed that less than 10 percent of liver transplants are from living
24 donors, and that most people who are willing to donate cannot be donors because of
25 health issues, psychosocial factors, or other technical issues unique to live donation.
26 (Doc. 161, ¶ 27; Doc. 170, ¶ 29.) On this issue, Plaintiff's medical experts offer only
27 speculation, and no reasonable jury could conclude that Defendants deprived Dixon of a
28 substantial possibility of survival. *See Lohse*, 860 P.2d at 1316 (upholding summary

judgment where "it was wholly speculative" whether harm could have been prevented absent alleged medical negligence).

## CONCLUSION

For the foregoing reasons, Plaintiff will be unable to carry her burden of proof at trial for any of her claims. Accordingly,

**IT IS ORDERED** that Defendants' motions for summary judgment, (Docs. 158, 160), are **GRANTED**. The Clerk shall terminate all remaining motions, enter judgment accordingly, and terminate this case.

Dated this 11th day of March, 2016.

Douglas L. Rayes
United States District Judge